# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

\* \* \*

LEANNE NESTER,

Plaintiff,

v.

RECREATIONAL EQUIPMENT, INC.,

Defendant.

Case No. 2:17-cv-03103-MMD-NJK

ORDER

## I. SUMMARY

Plaintiff Leanne Nester alleges that Defendant Recreational Equipment, Inc. ("REI") fired her, and took other adverse employment actions against her, because she is a heterosexual woman who suffers from hyperthyroidism. (ECF No. 1.) She specifically alleges discrimination and retaliation regarding her hyperthyroidism, and a sexual harassment claim with a retaliation component—mostly directed at one of her former supervisors. (*Id.*) Before the Court is Defendant's motion for summary judgment on all of Plaintiff's claims ("Motion") (ECF No. 34),[1] and motion to seal one of the exhibits to its Motion ("Motion to Seal") (ECF No. 36). As further explained below, the Court will grant the Motion in its entirety—as to Plaintiff's disability-related claims because of her failure to exhaust her administrative remedies, as to Plaintiff's sexual harassment claim because she was not subjected to an objectively hostile work environment, and as to her retaliation claim because Plaintiff failed to proffer sufficient evidence of pretext to rebut the legitimate, non-retaliatory business reasons Defendant proffers for each of the alleged adverse employment actions it took against Plaintiff. The Court will also grant Defendant's

---

[1]The Court has reviewed Plaintiff's response (ECF No. 35), and Defendant's reply (ECF No. 37).

1  Motion to Seal because Defendant provided compelling reasons to seal one exhibit to its
2  Motion.[2]

## II.    RELEVANT BACKGROUND[3]

Defendant owns and operates retail stores that sell outdoor sports clothing and equipment, such as kayaks and hiking boots. Plaintiff worked in Defendant's Boca Park, Las Vegas, Nevada store as a sales specialist from approximately June 2013 until May 13, 2017, when she was terminated. (ECF No. 1 at 2.) The gravamen of Plaintiff's Complaint is that she was fired because she rebuffed an invitation for a date from a manager, who then engaged in a campaign of retaliation against her that culminated with her termination. (*Id.* at 2-6.) She further alleges that both that manager, and the store manager of the store where she worked, discriminated against her because she has a disability—hyperthyroidism—and then retaliated against her because she refused to carry

---

[2]Plaintiff did not file a response to the Motion to Seal. Defendant seeks to seal Exhibit L because it contains confidential pricing information—specifically, the discounted prices at which Northwest River Supply ("NRS") offered its products to Defendant's employees as part of a "ProDeal" at issue in this case. (ECF No. 36 at 3-6.) Defendant argues for sealing under the correct "compelling reasons" standard that applies here. (*Id.* at 4.) *See also Kamakana v. City of Honolulu*, 447 F.3d 1172, 1178-79 (9th Cir. 2006). The Court agrees with Defendant that Exhibit L should be at least partially sealed, and will order Defendant to file a redacted version of Exhibit L on the Court's public docket. Specifically, the Court is persuaded that Exhibit L contains confidential pricing information that NRS provided to Defendant, which, if made public, could harm NRS' "business standing in that its competitors could tailor their product offerings and pricing to undercut" NRS in future dealings with Defendant. *Tdn Money Sys., Inc. v. Glob. Cash Access, Inc.*, Case No. 2:15-cv-02197-JCM-NJK, 2016 WL 4708466, at *2 (D. Nev. Sept. 7, 2016) (granting motion to seal customer invoices). The Court assumes that Defendant is a major customer for NRS and its competitors, and therefore disclosure of this information would substantially harm NRS. That said, the confidential pricing information contained in Exhibit L could easily be redacted, leaving email interactions between NRS and Defendant's employees meaningfully intact. *See id.* at *2 (citation omitted) (noting that the Court must consider the possibility of redaction). The Court will therefore order Defendant to file a redacted version of Exhibit L, with only the confidential prices redacted, along with unredacted and unsealed versions of the other exhibits to its Motion currently filed under seal, within 5 days of entry of this order.

[3]The following facts are undisputed unless otherwise noted.

1 a mobile point of sale device ("MPOS") in contravention of a note she obtained from her
2 doctor. (*Id.*) Thus, Plaintiff's claims break into two categories, disability discrimination and
3 related retaliation in violation of the Americans with Disabilities Act, as amended by the
4 ADA Amendments Act, 42 U.S.C. § 12101, *et seq.* (the "ADA"), and hostile work
5 environment sexual harassment and related retaliation in violation of Title VII the Civil
6 Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). (*Id.* at 1.) While
7 Plaintiff's factual allegations regarding these claims overlap, the Court will briefly describe
8 them somewhat separately below in the interest of clarity. But the Court will first describe
9 the facts relevant to Plaintiff's contested termination.

### A.  Plaintiff's Employment Termination

Defendant offers a "ProDeal" program, which allows employees to buy discounted or wholesale-priced merchandise from Defendant and its vendors.[4] (ECF No. 34 at 4; *see also* ECF No. 34-1 at 177.) "There are two types of ProDeals: Vendor ProDeals (which are offered and sold directly from one of REI's many participating vendors) and REI Gear & Apparel ProDeals[,]" which apply to REI-branded merchandise and Novara bicycles. (ECF No. 34-1 at 65.)

The former—a Vendor ProDeal—is relevant to Plaintiff's employment termination. Specifically, Plaintiff purchased a child's personal flotation device ("PFD") from Northwest River Supplies ("NRS"), for $22.55, for her then-boyfriend's son, using an NRS (vendor) ProDeal. (ECF Nos. 34 at 26-27, 34-1 at 495, 35-1 at 463, 628.) However, that particular ProDeal was limited to "Employee, Spouse, and Dependent children." (ECF No. 34-1 at 453.) The phrase "Dependent children" was not defined anywhere in the applicable NRS ProDeal, or Defendant's policies. (ECF No. 35-1 at 67-69.) Plaintiff admitted in a written statement completed relatively contemporaneously to the purchase, and in connection with the investigation leading to her termination, that she purchased the PFD for her

---

[4]The idea behind ProDeals is that salespeople will be more likely to purchase the products they sell for themselves because of the discount, making them better-informed and therefore more effective salespeople, while also helping with employee retention and morale—because employees can get discounted gear. (ECF No. 34-1 at 65-67.)

"stepson/nephew," writing "[i]t was wrong and Im [sic] Sorry [sic]." (ECF No. 34-1 at 495.) Plaintiff further testified at her deposition that the child for whom she purchased the PFD was not her natural child, she was not married to his father, she had not adopted him, and she never claimed him as a dependent for tax purposes. (ECF No. 35-1 at 215-227.) In addition, Defendant proffered a Performance Improvement Process Action form dated the day of Plaintiff's termination indicating she was involuntarily terminated for violating this particular NRS ProDeal. (ECF No. 34 at 26.)

While it is undisputed that a violation of Defendant's ProDeal policy is a terminable offense, the parties dispute whether every ProDeal policy violation will always result in termination. Plaintiff signed a document shortly after she started at Defendant that said, "I have read and understand the Prodeal and employee discount policy for REI. I understand that REI performs routine audits of employee purchases and periodically reviews full purchase history. Failure to abide by the rules of the program may result in disciplinary action up to and including termination of employment." (ECF No. 34-1 at 81.) Plaintiff's former store manager Michael Harcarik stated at his deposition that, "[t]ypically, a ProDeal violation would result in immediate termination." (ECF No. 35-1 at 69.) Defendant's employee handbook also states that ProDeal violations are a terminable offense. (ECF No. 34-1 at 67 ("As much as REI hates to lose great employees, if you misuse the employee discount or ProDeal program, your employment may be terminated immediately without being given a "warning" or the opportunity to improve.").) But Plaintiff proffered two declarations from her former coworkers, who said that they knew of other employees who violated the ProDeal policy, or had violated the ProDeal policy themselves, but were not terminated. (ECF No. 35-1 at 176-181.) Further, Harcarik testified at his deposition that store managers retain some discretion over termination decisions in the event of a ProDeal policy violation. (ECF No. 34-1 at 185-191.)

**B.  Disability-Related Claims**

As to Plaintiff's ADA claims, Plaintiff was diagnosed in 2013 with Grave's disease and its resulting hyperthyroidism, where the thyroid overproduces hormones. (ECF Nos.

34-1 at 102, 35-1 at 363-64, 368-69.) On July 14, 2016, she got a doctor's note (the "Doctor's Note") stating: "Please be advised that this patient has medical concerns/condition that preclude the persistent use of any device that emits electromagnetic frequency for prolonged periods (>3hr continuous). For this reason, phone is a device that may present concern and or/potential hazard to the above." (ECF No. 34-1 at 293.) Plaintiff interpreted the Doctor's Note to mean that she could not carry an MPOS while at work. (ECF No. 35-1 at 53, 352-55.) Plaintiff therefore generally did not carry an MPOS, and would hide any MPOSs she was given around the store so that she did not have to carry one. (*Id.* at 360.) She gave the Doctor's Note to her store manager, Harcarik, who added it to her file. (*Id.* at 351.)

However, one time, another manager, Sarah Webster (located in between Plaintiff and Harcarik in the management hierarchy) asked Plaintiff to use her MPOS, and Plaintiff said she was not carrying one. (*Id.* at 347-48.) Webster told Plaintiff that meant she was out of uniform and could be terminated for not carrying a MPOS. (*Id.* at 348.) On several other occasions, some of which were after she gave Harcarik the Doctor's Note, Webster told Plaintiff she had to carry the MPOS. (*Id.* at 361.) Plaintiff testified she told Webster she gave Harcarik a doctor's note indicating she did not have to carry a MPOS twice, but Webster still asked her to check one out. (*Id.* at 360.)

### C. Sexual Harassment Claim

Plaintiff alleges that Webster asked her out on a date shortly after Webster was transferred to the store where Plaintiff worked. (ECF No. 6 at 2-3.) According to Plaintiff, on one occasion, when Plaintiff was leaving her shift, Webster held the store entrance door open for her. (ECF No. 35-1 at 335.) Then Webster followed Plaintiff out the door. (*Id.* at 335-36.) Webster said to Plaintiff, "go trail running with me." (*Id.* at 336.) Plaintiff explained in response that she was "not really a runner," and told Webster to see if another employee, who Plaintiff knew liked trail running, would go with her instead. (*Id.*) Webster responded that she "didn't ask [the other employee]. I asked you." (*Id.*) Plaintiff backed away as their conversation continued, and eventually turned around and walked

away. (*Id.*) At one point, as Plaintiff was moving away from Webster, Webster said "I see how you are." (*Id.*) Plaintiff perceived this conversation as a request for a date because of the way Webster asked her, and her body language—not because Webster ever used the word date. (*Id.* at 338-42.)

Plaintiff reported this conversation to Harcarik shortly after it happened. (*Id.* at 343-44.) Harcarik told her, "[y]ou have my permission to skip the chain of command and come to me if she is inappropriate anymore to you." Plaintiff did not report the conversation to anyone else, made no written report about it, and Webster never asked Plaintiff out on a date on any other occasion. (*Id.* at 344-47.) Harcarik checked in with Plaintiff weekly about her interactions with Webster, to make sure Webster was being appropriate, and that Plaintiff's concerns were being addressed. (*Id.* at 536-38.) However, Plaintiff alleges that Webster nevertheless began a campaign of harassment and retaliation against her after the conversation that Plaintiff perceived to be a request for a date. (*Id.* at 347-48.)

### D. Complaint to the U.S. Equal Employment Opportunity Commission ("EEOC")

Shortly after she was terminated, Plaintiff submitted a questionnaire to the EEOC (the "Questionnaire"). (ECF No. 34-1 at 497.) In response to the question, "Do You Have a Disability?" Plaintiff checked the box for yes. (*Id.*) However, in response to the question, "What is the reason (basis) for your claim of employment discrimination?" Plaintiff only checked the boxes for "Sex" and "Retaliation," and did not check the box for "Disability." (*Id.* at 499.) Later, in a section of the form prefaced by the instructions, "Answer questions 9-12 only if you are claiming discrimination based on disability[,]" Plaintiff checked a box labelled, "Yes, I have a disability," but otherwise left questions 9-12 entirely blank, including lines allowing for a narrative answer. (*Id.* at 500.) At the conclusion of the form, Plaintiff checked Box 2 indicating she would like to immediately file a charge of discrimination. (*Id.* at 501.)

Plaintiff later received a right-to-sue letter from the EEOC, with a box checked stating that "the EEOC is unable to conclude that the information obtained establishes

violations of the statutes." (*Id.* at 503.) The right-to-sue letter indicates nothing about the substance of Plaintiff's allegations. (*Id.*) The EEOC sent Defendant a Notice of Charge of Discrimination ("the Charge") stemming from Plaintiff's questionnaire. (*Id.* at 504.) The Charge notified Defendant of claims of discrimination "based on Retaliation and Sex, and involve issues of Harassment, Discipline, and Discharge that are alleged to have occurred on or about May 13, 2017." (*Id.*) There is no mention of a disability, or any disability-related discrimination, on the face of this document. (*Id.* at 504-5.)

## III.     LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court.*" Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *See id.* at 250-51. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *See Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

The moving party bears the burden of showing that there are no genuine issues of material fact. *See Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting

the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps.*, Inc., 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 783 (9th Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.

## IV. DISCUSSION

The Court addresses below Defendant's Motion with respect to each of Plaintiff's two categories of claims, first addressing Plaintiff's disability-related claims together, then addressing Plaintiff's sexual harassment and retaliation claims in turn.

### A. Disability-Related Claims

Defendant argues it is entitled to summary judgment on all of Plaintiff's disability-related claims because she failed to exhaust her administrative remedies as to those claims. (ECF No. 34 at 9-12.) Plaintiff counters in relevant part that she properly exhausted because she checked two boxes on the Questionnaire stating that she has a disability, she explained her disability-related allegations to an EEOC employee when she met with him in person, and Defendant attacks the wrong document because the Questionnaire is not a Charge of Discrimination. (ECF No. 35 at 10-11, 12-13.) Defendant replies that the Questionnaire can serve as a charge if it meets the elements of a charge, it does, and it shows Plaintiff failed to exhaust. (ECF No. 37 at 3-5.) The Court essentially agrees with Defendant.

"To file suit for a Title VII, ADA, or ADEA claim, a plaintiff must first timely file a charge of employment discrimination with the EEOC." *Kennedy v. Columbus Mfg., Inc.*, Case No. 17-CV-03379-EMC, 2017 WL 4680079, at *2 (N.D. Cal. Oct. 18, 2017) (citations omitted). In other words, "Plaintiff was required to exhaust her administrative remedies."

*B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1099 (9th Cir. 2002), *as amended* (Feb. 20, 2002).[5] In determining whether Plaintiff properly exhausted, the Court must construe EEOC charges with liberality, and "the crucial element of a charge of discrimination is the factual statement contained therein." *Id.* at 1000 (citation omitted). But "[a]llegations of discrimination not included in the plaintiff's administrative charge may not be considered by a federal court unless the new claims are like or reasonably related to the allegations contained in the EEOC charge." *Id.* (internal quotation marks and citations omitted). The purpose of the exhaustion requirement is to give Defendant notice of Plaintiff's claim, and to narrow the issues for prompt adjudication. *See id.* at 1099.

Here, the Charge contained no mention of any ADA claims. (ECF No. 34-1 at 504.) However, the Questionnaire may also be considered Plaintiff's EEOC charge. *See id.* at 1102; *see also Kennedy*, 2017 WL 4680079, at *2, *2-*3 (stating that "[a]n EEOC Intake Questionnaire may qualify as a charge for exhaustion purposes" in a case involving ADA claims); *Federal Express Corp. v. Holowecki*, 552 U.S. 389, 402, 404-6 (2008) (treating an intake questionnaire as a charge in an age-discrimination case). Therefore, the Court will also consider the Questionnaire in determining whether Plaintiff properly exhausted.

The Questionnaire must meet two requirements to be considered Plaintiff's EEOC charge: (1) it must contain an allegation and the name of the charged party; and (2) it must be reasonably construed as a request for the EEOC to protect the plaintiff's rights, or to otherwise settle a dispute between the plaintiff and her former employer. *See Kennedy*, 2017 WL 4680079, at *2 (citing *Holowecki*, 552 U.S. at 402). The Questionnaire meets these requirements. It contains allegations (ECF No. 34-1 at 499-501), and the charged party's name (*Id.* at 497-98). It can also reasonably be construed as a request for the EEOC to protect Plaintiff's rights, because Plaintiff checked a box indicating she would like to immediately file a charge of discrimination, as opposed to the box stating

---

[5] While *B.K.B. v. Maui Police Dep't* is a Title VII case, the same exhaustion requirement applies to Plaintiff's ADA claims at issue here. *See, e.g.*, *McWilliams v. Latah Sanitation, Inc.*, 149 Fed. App'x 588, 589 (9th Cir. 2005) ("To maintain a disability discrimination action under the ADA, the complainant must exhaust his administrative remedies[.]").

she would merely like to talk to an EEOC employee before deciding whether to file a charge. (*Id.* at 501.) Thus, the Court construes the Questionnaire as a charge for purposes of this exhaustion analysis. *See Kennedy*, 2017 WL 4680079, at *2-*5 (finding that an intake questionnaire was a charge).

But even considering the Questionnaire, Plaintiff failed to exhaust her administrative remedies as to her ADA-related claims because the Questionnaire lacks any factual statements regarding Plaintiff's ADA-related claims. (ECF No. 34-1 at 497-501.) *See also Freeman v. Oakland Unified Sch. Dist.*, 291 F.3d 632, 638 (9th Cir. 2002) (affirming district court's dismissal of Title VII claims where the factual allegations in the plaintiff's complaint were neither like nor reasonably related to the factual allegations in his EEOC charge); *B.K.B. v. Maui Police Dep't*, 276 F.3d at 1100 (emphasizing that the crucial element of the charge is the factual statement). The Court finds that Plaintiff's ADA-related claims are not "like or reasonably related to the allegations contained in" the Questionnaire, which allege harassment, bullying, threatening termination, and unequal treatment (ECF No. 34-1 at 497-501), but do not tie these allegations to any factual allegations regarding any protected characteristic, much less a disability. *B.K.B. v. Maui Police Dep't*, 276 F.3d at 1000 (standing only for the quoted proposition and not the substantive result of that opinion).

Further, Plaintiff only checked the boxes for "Sex" and "Retaliation" in response to the question "What is the reason (basis) for your claim of employment discrimination?" (ECF No. 34-1 at 499.) And while Plaintiff did check two boxes on the form indicating she had a disability, neither was accompanied by any factual allegations. (*Id.* at 498, 500.) Further, the second box Plaintiff checked indicating she had a disability was in a section asking her questions about disability discrimination claims that she otherwise left blank. (*Id.* at 500.) If Plaintiff wanted to allege disability discrimination, she would have filled the rest of this section out. In addition, nowhere on the form did she include any narrative explanation indicating that she was pursuing a disability-related claim. (*Id.* at 497-501.)

1 Thus, the Questionnaire provides insufficient notice Plaintiff was pursuing a disability-related claim.

The Court therefore finds that Plaintiff failed to exhaust her administrative remedies regarding her ADA claims. The Court will thus dismiss Plaintiff's ADA claims for failure to exhaust administrative remedies.

### B. Hostile Work Environment Sexual Harassment Claim

Defendant argues it is entitled to summary judgment on Plaintiff's hostile work environment sexual harassment claim because Plaintiff's workplace was not objectively hostile. (ECF No. 34 at 15-18.) Plaintiff counters there is sufficient evidence such that a reasonable jury could conclude Webster created an objectively hostile work environment for Plaintiff, and specifically and primarily points to the conversation where Plaintiff perceived that Webster asked Plaintiff on a trail running date. (ECF No. 35 at 15-16.) Defendant also argues in reply that Plaintiff has presented no evidence that Webster's conduct towards Plaintiff beyond the trail running invitation was based on Plaintiff's sex. (ECF No. 37 at 14.) The Court agrees with Defendant.

To prevail on her hostile work environment claim, Plaintiff must show that the "workplace [was] permeated with discriminatory intimidation . . . that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks omitted)). "The working environment must both subjectively and objectively be perceived as abusive." *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995). Relevant to the inquiry is the frequency, severity, and level of interference with work performance; however, the Court must use a totality of the circumstances test to determine whether a plaintiff's allegations make out a colorable claim. *See Brooks*, 229 F.3d at 923-24 (citing *Harris*, 510 U.S. at 23); *see also Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003), *as amended* (Jan. 2, 2004) (noting that the test also includes an inquiry into whether the harassing conduct "is physically threatening or humiliating, or a mere

offensive utterance; and whether it unreasonably interferes with an employee's work performance.") (citation omitted). "When assessing the objective portion of a plaintiff's claim, we assume the perspective of the reasonable victim." *Brooks*, 229 F.3d at 924 (citing *Ellison v. Brady*, 924 F.2d 872, 879 (9th Cir. 1991)).

The first incident in Webster's alleged campaign of retaliatory harassment against Plaintiff following the conversation Plaintiff perceived as a date request was Plaintiff's interaction with Webster described *infra*, where Webster told her she could be fired for not carrying an MPOS.[6] (ECF No. 35-1 at 347-48.) Second, Plaintiff alleges Webster reprimanded and wrote her up for violations of minor rules that she allegedly did not write other employees up for violating, such as having non-approved beverage cups or food on the sales floor, specifically including one incident where Webster yelled at Plaintiff that she would be fired when Webster saw her holding a Starbucks coffee cup, though Plaintiff contends she was only cleaning up after some customers who had left it there. (*Id.* at 520-530.) Third, Plaintiff alleges Harcarik and Webster made her wait longer than other employees had to wait for bag checks,[7] up to eight times amongst the approximately 150 to 250 bag checks she underwent during the relevant time period. (*Id.* at 539-555.) Fourth, Plaintiff contends that her termination was also part of this retaliation campaign.[8] (*Id.* at 456-57.) Fifth, Plaintiff states she was offended by Webster's suggestion to another employee while in earshot of Plaintiff that Defendant should hire more lesbians[9] because she feels that individuals should be hired based on skill, rather than sexual orientation. (*Id.* at 535-36.) Sixth, Plaintiff alleges Webster timed her while she went to the bathroom

---

[6]Plaintiff appears to argue that the incidents described in this paragraph go to both her hostile work environment sexual harassment claim, and her retaliation claim.

[7]Defendant's employees are required to have their bags (*e.g.* backpacks, purses) checked by a manager, at the front of the store, at the conclusion of each shift, to make sure employees are not stealing merchandise. (ECF No. 35-1 at 539-40.)

[8]Again, Defendant disputes this.

[9]The Court uses the term lesbian herein because that is the term Plaintiff used in her deposition, and both parties refer to that testimony throughout their briefing.

and would not let her use the bathroom outside of designated breaks, though other employees were allowed to. (*Id.* at 380-81.) Seventh, Plaintiff alleges Webster instructed Plaintiff's co-workers not to socialize with her outside of work. (*Id.* at 458.) Eighth, Webster never gave Plaintiff a courtesy call when another employee who was covering Plaintiff's shift failed to show up for that shift, though Webster would normally courtesy call other employees under similar circumstances. (*Id.* at 457.)

Webster's trail-running date request and subsequent alleged retaliatory harassment of Plaintiff was insufficiently severe or pervasive to give rise to Title VII liability for Defendant. To start, the date request was a one-time event, which occurred four to five months into Plaintiff and Webster working together, where Webster never used the word date. (ECF No. 34 at 189-190, 192.) Because "[t]he required level of severity or seriousness 'varies inversely with the pervasiveness or frequency of the conduct[,]'" *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 872 (9th Cir. 2001) (citation omitted), the fact Webster only arguably asked Plaintiff out once significantly cuts against a finding that Webster created a hostile work environment for Plaintiff. Further, beyond Plaintiff brushing against Webster as she walked past her, Webster did not touch Plaintiff during this interaction—and that too cuts against a finding that Webster created an objectively hostile work environment. (ECF No. 34 at 186-87.) *See also Vasquez*, 349 F.3d at 642 (directing courts to consider whether the conduct is physically threatening); *Brooks*, 229 F.3d at 923-27 (granting summary judgment to defendant employer even where the plaintiff's supervisor had rubbed her stomach and groped her breast, accompanied by verbal sexual advances, in a single assault leading to supervisor's termination and criminal conviction). In addition, Plaintiff admitted it was common for employees of Defendant to do things like go trail running together, and that she often socialized with other employees. (ECF No. 34 at 187-88.) Viewed in that context, Webster's request does not rise to the level of severe and pervasive conduct sufficient to create an abusive work environment.

13

There was another incident, where Webster said to another employee while Plaintiff was standing nearby, "we need to hire more lesbians." (ECF No. 34-1 at 368-72.) However, this comment is also not so objectively offensive as to create an abusive work environment. First, even Plaintiff conceded the comment was not directed at her; she just happened to overhear it. (*Id.* at 369.) The comment also contained no expletives, slurs, or necessarily demeaning language, and nothing in the record indicates it was intended to be hurtful. *See, e.g.*, *Vasquez*, 349 F.3d at 643 (distinguishing the case from another case involving slurs). Webster also only made this comment once, which cuts against finding it contributed to an objectively hostile work environment.[10] *See, e.g.*, *Kortan*, 217 F.3d at 1111 (holding that the fact that the offensive conduct was concentrated on one occasion contributed to finding it insufficiently severe and pervasive).

In addition, while Plaintiff offers evidence to show that Webster yelled at Plaintiff for rules violations, or perceived rules violations (*see, e.g.*, ECF No. 35-1 at 106, 528-29), she has failed to show that such conduct was directed at her because of her sex. *See Smith*, 240 F. Supp. 2d at 1116-7 (granting summary judgment to employer on the alternative basis that harassment was not because of the plaintiff's sex). Moreover, Webster's reprimands for the policy violations described *supra* were insufficiently severe or pervasive to create an objectively hostile work environment.

In general, Webster's conduct towards Plaintiff is simply less severe than conduct found by other courts to be insufficiently severe to support a hostile work environment claim. For example, in *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1108, 1111 (9th Cir. 2000), the Ninth Circuit found that the alleged harassment was insufficiently severe or pervasive when the female plaintiff's male supervisor referred to females as "castrating

---

[10] It is additionally unclear to the Court whether Plaintiff even found the comment subjectively offensive, because she both said she did, and did not. (ECF No. 34-1 at 369.) Further, Plaintiff explained she was offended by the comment not because it was directed at her, but instead because she thinks people should be hired based on skill—not based on sexual orientation. (*Id.*) It is therefore unclear whether Plaintiff found this comment subjectively offensive, further weighing against a finding that it contributed to an abusive work environment.

bitches," "Madonnas," or "Regina" in front of plaintiff on several occasions, and directly called plaintiff "Medea." In *Smith v. Cty. of Humboldt*, 240 F. Supp. 2d 1109, 1113, 1117-18 (N.D. Cal. 2003), that court found conduct to be insufficiently severe and pervasive where the female plaintiff's female supervisor—over a ten-day period—pushed plaintiff's head, sat in a chair the plaintiff had vacated, brushed up against the plaintiff in the bathroom, hit the plaintiff's cheekbone, tried to sit next to the plaintiff at lunch, touched the plaintiff, and hit her on the shoulder to get her attention. *See id.* at 1113. The alleged harasser's conduct in both of these cases was more severe and pervasive than Webster's conduct, and Harcarik's alleged actions at issue here—and in both of those cases, the conduct was found insufficiently severe to support Title VII liability.

Therefore, the Court will grant the Motion with respect to Plaintiff's hostile work environment sexual harassment claim.

### C. Retaliation Claim

Plaintiff also alleges that Webster and Harcarik retaliated against her after she complained to Harcarik about Webster's arguable trail running date request. (ECF No. 1 at 5.) Defendant argues it is entitled to summary judgment on this claim because Plaintiff cannot establish her *prima facie* case—she fails to provide any evidence she was subjected to any adverse employment actions based on a retaliatory motive—and even if she could, it proffered legitimate reasons for each of Plaintiff's alleged adverse employment actions. (ECF No. 34 at 19-20.) Plaintiff counters that disputes of material fact preclude summary judgment as to this claim. (ECF No. 35 at 16-18.) The Court agrees with Defendant. Even assuming Plaintiff can establish her *prima facie* case, Plaintiff has failed to demonstrate that a genuine issue of material fact remains to show that Defendant's proffered legitimate reasons for taking its alleged adverse employment actions against Plaintiff were pretextual.

To prevail on a retaliation claim, a plaintiff must first establish a *prima facie* case of retaliation by demonstrating: (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity

and the adverse employment action. *See Dawson v. Entek*, 630 F.3d 928, 936 (9th Cir. 2011). "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). If a plaintiff establishes her *prima facie* case, "the burden of production shifts to the employer to present legitimate reasons for the adverse employment action." *Brooks*, 229 F.3d at 928 (citation omitted). "Once the employer carries this burden, plaintiff must demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was a pretext." *Id.* (citation omitted). "Only then does the case proceed beyond the summary judgment stage." *Id.*

A plaintiff can show pretext in two ways: either "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Stegall v. Citadel Broadcasting Co.,* 350 F.3d 1061, 1068 (9th Cir. 2004) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). Where, as here, Plaintiff seeks to establish pretext through circumstantial evidence, it "must be specific and substantial in order to survive summary judgment." *Bergene v. Salt River Project Agr. Imp. & Power Dist.*, 272 F.3d 1136, 1142 (9th Cir. 2001).

Assuming for purposes of this analysis Plaintiff can establish her *prima facie* case, Defendant's proffered reason for Plaintiff's termination is Plaintiff's undisputed violation of its ProDeal policy. (ECF Nos. 34 at 26, 34-1 at 495 (admitting in writing that she violated the policy).) The burden then shifts to Plaintiff to demonstrate her termination was pretextual despite her admission that she violated a policy that may result in termination. *See Brooks*, 229 F.3d at 928 (noting that the burden shifts). Plaintiff primarily argues that her termination demonstrates retaliation by Harcarik because she did not violate the ProDeal policy, and Harcarik had discretion not to terminate her for the violation, but did anyway—because she complained to Harcarik about Webster's arguable trail running date request. (ECF No. 35 at 16-17.) While Plaintiff does not explicitly phrase this argument as one for pretextual termination, the Court construes it as such. But the

evidence presented does not constitute the specific and substantial evidence of pretext necessary to proceed past summary judgment here. *See Bergene*, 272 F.3d at 1142 (requiring a plaintiff to present specific and substantial evidence of pretext where, as here, the plaintiff relies on circumstantial evidence of pretext). The Court next addresses Plaintiff's proffered argument and evidence.

First, Plaintiff argues that she did not violate the ProDeal policy. (ECF No. 35 at 10, 16-17.) However, to the extent Plaintiff did not understand the terms of this NRS Vendor ProDeal (*i.e.*, whether her boyfriend's son qualified), Plaintiff could have asked before placing her order. But she did not. More importantly, her retroactive justifications for violating this particular ProDeal regarding the definition of "Dependent children" are flatly contradicted by her signed admission at the time. (ECF No. 34-1 at 495.)

Second, Plaintiff offers two declarations as evidence that her termination for violation of the ProDeal policy was not inevitable to suggest the proffered reason for her termination was pretextual. (ECF Nos. 35 at 17 (referring to ECF No. 35-1 at 176-181).) But these declarations do not constitute specific and substantial evidence of pretext as to Plaintiff's termination because they simply do not speak to the ProDeal policy in place at the store where Plaintiff worked, at the time she was terminated. Specifically, Plaintiff proffered a declaration from Michelle Overbay (ECF No. 35-1 at 177-78), and one from Wendy Johnson (*id.* at 180-81). Both women worked with Plaintiff at the Boca Park, Las Vegas, REI store. (*Id.* at 177-81.) Ms. Overbay says that she knows REI did not have a zero-tolerance policy regarding ProDeal violations because a manager instructed her at one point not to check ProDeal orders, and because she made several ProDeal purchases for her stepchildren—and was not terminated as a result of these incidents. (*Id.* at 177-78.) However, Ms. Overbay also says that she worked at several REI stores, but does not say whether these ProDeal-related incidents occurred at the Boca Park store where Plaintiff worked, or that they occurred while Harcarik was the store manager. (*Id.*) Thus, Ms. Overbay's declaration creates no dispute as to whether Plaintiff's firing was pretextual because it does not speak to the policy at the Boca Park store at the time

Plaintiff was terminated—and Harcarik, the manager of that store at the time, testified that ProDeal violations normally resulted in termination. (*Id.* at 69.) And while Wendy Johnson says she violated Defendant's ProDeal policy while working at the Boca Park store in 2013, and was not fired, her declaration also does not create a dispute of material fact as to pretext. (*Id.* at 180-181.) Harcarik did not become the store manager of the Boca Park store until 2015. (*Id.* at 10.) Harcarik did not even work at the Boca Park store when Ms. Johnson bought an unauthorized down jacket for her sister. (*Id.* at 14-15.) Thus, Ms. Johnson's experience does not speak to the policy in place at the Boca Park store at the time Plaintiff was terminated. Therefore, neither of these declarations creates a factual dispute as to whether Plaintiff's termination was pretextual.

Finally, Plaintiff argues that a reasonable jury could find that Defendant's proffered reason for termination is not credible because Harcarik had discretion to determine whether to terminate Plaintiff for a violation of the ProDeal policy. (ECF No. 35 at 17.) But while Harcarik testified that store managers retain some discretion over termination decisions in the event of a ProDeal policy violation, he did also explain the distinction between the circumstances surrounding Plaintiff's violation and those surrounding other employees who were not terminated for violation of the policy. (ECF No. 34-1 at 185-191; *see also* ECF No. 37 at 19.) Further, Plaintiff offers no evidence to show that Harcarik's exercise of his discretion to terminate Plaintiffs employment was pretextual. In fact, Harcarik's unrebutted testimony was that the ultimate termination decision at issue here was a group decision once he placed a call to Defendant's asset protection group about Plaintiff's ProDeal policy violation, so other people were involved in the decision that Plaintiff does not even allege were attempting to retaliate against her. (ECF No. 34-1 at 238-245.) Plaintiff has therefore failed to present the specific and substantial evidence that her termination was pretextual necessary to proceed past summary judgment.

Plaintiff has also failed to proffer any evidence of pretext to rebut the legitimate reasons proffered by Defendant for Harcarik and Webster's actions that fall under the category of enforcing Defendant's internal rules. (ECF No. 35 at 17-18.) The Court is

specifically referring to Plaintiff being coached and written up for drinking out of non-approved cups, and having food in an unauthorized location, along with Plaintiff's allegation that Harcarik and Webster made her wait longer than others to have her bag checked at the end of a shift, and that she was forced to wait until her breaks to use the bathroom, while others were not. There simply can be no real dispute there are legitimate reasons for these policies—to prevent food and drinks from spilling on merchandise, to prevent employees from stealing merchandise, and to make sure salespeople are available to assist customers. And Plaintiff has proffered no evidence beyond her own statements to support her claim that these policies were selectively enforced against her.[11] Thus, Plaintiff has failed to show there is a genuine dispute regarding pretext as to these rule violations.[12]

In sum, the Court will grant Defendant's Motion as to Plaintiff's retaliation claim.[13]

---

[11]There is no evidence in the record as to whether other employees were disciplined for food and drink violations beyond Plaintiff's statements. The same goes for when other employees were allowed to take bathroom breaks. There is also no evidence in the record beyond her statements that Plaintiff had to wait longer than other employees to have her bag checked. While Plaintiff stated during her deposition that she had a notebook where she recorded the length of all of her bag checks, and also other employees' bag checks—and said she would provide it to her counsel to be produced to Defendant—apparently, she never provided the notebook. (ECF Nos. 34-1 at 373-90, 37 at 10.)

[12]Plaintiff also argues that "Webster also isolated Plaintiff from her co-workers by instructing her co-workers not to communicate with her or socialize with her." (ECF No. 35 at 17.) Plaintiff's briefing provides no record citation to support this statement. Moreover, there is no support for this statement in the record beyond the Complaint and Plaintiff's declaration submitted in support of her opposition to the Motion. (ECF Nos. 1 at 2, 35-1 at 458.) Regardless, "an employer cannot force employees to socialize with one another[.]" *Brooks*, 229 F.3d at 929. Therefore, "ostracism suffered at the hands of coworkers cannot constitute an adverse employment action." *Id.* For this reason, the Court does not even consider Plaintiff's allegation that Webster directed other people not to socialize with her in the context of analyzing Plaintiff's retaliation claim.

[13]Plaintiff's Complaint refers to a Nevada state statute, NRS § 613.310, *et seq.* (ECF No. 1 at 1.) Neither party mentions the state law in their briefing on Defendant's Motion. To the extent Plaintiff asserts claims based on this state law, the Court's analysis of her state law claims would be identical to the Court's analysis of her claims based on federal law conducted herein. *See Puckett v. Porsche Cars of N. Am., Inc.*, 976 F. Supp.

## V. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the motions before the Court.

It is therefore ordered that Defendant's motion for summary judgment (ECF No. 34) is granted as to Plaintiff's sexual harassment and retaliation claims.

It is further ordered that Plaintiff's ADA claims (ECF No. 1 at 4-5) are dismissed for failure to exhaust.

It is further ordered that Defendant's motion to seal (ECF No. 36) is granted.

The Clerk of Court is directed to maintain ECF No. 34-1 under seal.

It is further ordered that Defendant must file a new, unsealed version of ECF No. 34-1, with only the confidential prices contained within Exhibit L redacted (ECF No. 34-1 at 425-493), within 5 days of the date of entry of this order.

The Clerk of Court is further directed to enter judgment in Defendant's favor in accordance with this order, and close this case.

DATED THIS 19th day of July 2019.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE

---

957, 960 (D. Nev. 1997), *aff'd sub nom. Puckett v. Porsche Cars N. Am., Inc.*, 165 F.3d 917 (9th Cir. 1998) ("The language of N.R.S. § 613.310, the corresponding Nevada statute, is almost identical to the language of the ADA; the court will therefore look to federal cases for guidance in applying the Nevada statutes."); *Samuels v. We've Only Just Begun Wedding Chapel, Inc.*, 154 F. Supp. 3d 1087, 1093 (D. Nev. 2015) ("Claims for unlawful discrimination under § 613.330 are analyzed under the same principles applied to similar Title VII claims.") Therefore, to the extent Plaintiff is alleging violations of Nevada law, the Court will also grant summary judgment to Defendant on those state law claims—for the same reasons it will grant Defendant summary judgment on Plaintiff's federal law claims.